493 So.2d 1186 (1986)
In re John MILKOVICH.
No. 85-KK-2028.
Supreme Court of Louisiana.
September 8, 1986.
*1188 Donald Minor, Troy E. Bain, Shreveport, for applicant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul J. Carmouche, Dist. Atty., Powell Layton, Jr., James Cowles, Jr., Asst. Dist. Attys., for respondent.
LEMMON[*], Justice.
We granted certiorari to review relator's convictions on four citations of direct contempt of court which occurred during his representation of a criminal defendant in a five-day trial that resulted in the client's acquittal on a charge of attempted second degree murder. Relator was sentenced during the trial to a fine of $100 on the first count, and sentencing on the other three counts was deferred until after the trial. The trial judge ultimately sentenced relator to consecutive twenty-four-hour terms of imprisonment on the remaining three counts. We now affirm the conviction and sentence on the fourth citation, but reverse on the first three citations, concluding that the evidence was insufficient to support the convictions.
Relator was convicted of direct contempt of court which is defined in part pertinent to this case by La.C.Cr.P. Art. 20 and 21 as follows:
"A contempt of court is an act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority.
"Contempts of court are of two kinds, direct and constructive." Article 20.
"A direct contempt of court is one committed in the immediate view and presence of the court and of which it has personal knowledge; or, a contumacious failure to comply with a subpoena, summons or order to appear in court, proof of service of which appears of record; or, a contumacious failure to comply with an order sequestering a witness.
"A direct contempt includes, but is not limited to, any of the following acts:
. . . . .
"(5) Contumacious, insolent, or disorderly behavior toward the judge or an attorney or other officer of the court, tending to interrupt or interfere with the business of the court or to impair its dignity or respect for its authority." Article 21(5).
The power to punish contemptuous conduct is essential to the fair and efficient administration of justice and to the preservation of the dignity and authority of the courts. Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); In re Masinter, 355 So.2d 1288 (La.1978). This power, however, is subject to abuse and should never be exercised to stifle zealous advocacy. Proper use of the contempt power, particularly when used to punish direct contempt, requires the exercise of sound judicial discretion.
Relator's primary contention is that the record does not establish that he intended to obstruct, disrupt or interfere with the administration of justice and that his conduct merely amounted to a fervent effort to provide effective assistance to his client.
This is a criminal contempt proceeding, since the object was to punish relator for contemptuous behavior in the presence of the court.[1]State v. Austin, *1189 374 So.2d 1252 (La.1979); W. LeFave & A. Scott, Criminal Law § 7 (1972); R. Perkins, Criminal Law 532 (1969). Criminal contempt is a crime in every fundamental respect, and the defendant in a criminal contempt proceeding is entitled to the basic constitutional protections such as the presumption of innocence, the right to proof of guilt beyond a reasonable doubt, and the right not to be compelled to testify against himself. Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).
The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal proceeding against conviction of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged". In re Winship, 397 U.S. 358 (1970). On appellate review of a criminal conviction, the reviewing court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the crime of which the defendant was convicted was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984). Thus, an appellate court reviewing this conviction of criminal contempt under Article 21(5) must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant's acts constituted contumacious, insolent, or disorderly behavior toward the judge or an attorney or other officer of the court, tending to interrupt or interfere with the business of the court or to impair its dignity or respect for its authority.
At the outset relator argues that a record of the transcript of the entire proceeding is necessary for a proper review of his convictions.[2] The absence of a complete record is actually favorable to relator as to the first three convictions, since these convictions are being reversed on the basis of insufficient evidence contained in this record. As to the fourth conviction which involves a citation for contempt during closing argument, the record of the entire closing arguments by all counsel is complete (and is supplemented by an audiotape of the arguments). None of the "instances of unfair restrictions on petitioner", which relator asserts in brief would be revealed by a complete transcript of the entire trial, have any bearing on the fourth citation.[3]
We separately discuss the facts of each citation and make appropriate dispositions.

First Contempt Citation
Relator was first cited for contempt on account of a remark during his opening statement that "[p]rior convictions cannot be used in determining guilt or innocence". In order to consider this occurrence in proper perspective, it is necessary to review certain earlier events.
During the voir dire examination of a prospective juror, relator objected to the prosecutor's question about the juror's understanding that evidence of prior convictions, while not appropriate to be considered in the determination of guilt of the charged offense, may be considered in the determination of the accused's credibility. The trial judge noted the difficulty of framing questions which completely stated the applicable law, and the attorneys agreed to limit their questioning on the subject.
At a later point in the voir dire, the court held a bench conference on an objection to relator's prefacing his questioning with lengthy statements of his philosophy and his opinion about this particular case. *1190 When relator claimed that this was "his style", the judge instructed relator that argument is not appropriate during voir dire, regardless of style. Relator then stated:
"I am using voir dire techniques which are well-established by trial lawyers such as Jerry Spence who spends a great deal of time on voir dire using and touching upon the very same things which I am addressing. They may not do it in Shreveport, down in the far south where things are conservative, but some places in America they do it this way.... I fully intend to comply with whatever orders you make, Judge, but I don't think he is doing voir dire different from the way we do it or from the way conservative lawyers in Shreveport who have never been out of the south do it. I don't think that is a valid objection. This is perhaps an unconventional voir dire, I don't believe that I am violating any ethical rules or any legal rulings. But, I will comply with whatever you tell me to do...."
Thereupon the court again instructed relator not to argue the case during voir dire.
After the jury was selected, the judge in conference instructed the attorneys not to make arguments or to give statements of philosophy during the opening statement, but merely to outline the evidence to be offered and to explain the nature of the defense.
Relator began his opening statement by outlining the defense version of the facts. When he stated his opinion that there was a reasonable doubt as to his client's guilt, the prosecutor objected, and the judge maintained the objection. Three more arguments were objected to with the same result. Relator then stated that constitutional principles insure that innocent persons not be condemned and that innocence is presumed, even if the accused has a prior conviction. He followed with the statement of the prohibition against using prior convictions to determine guilt. When the prosecutor objected to the remark as argument, the judge called a conference outside the jury's presence. After a discussion with relator, the judge stated that "defense counsel has made a deliberate, knowing, and, intentional violation of the order specifically entered in by this Court with respect to opening statements" and found relator in contempt of court for repeatedly arguing in violation of the court's order not to make arguments during the opening statement.
When an attorney persistently violates the rules laid down by the trial judge for opening statements, the usual sanction is to restrict or terminate the opening statement. Of course, if the attorney's violation of such rules is done with the intention of disrupting the proceedings or impairing the dignity of the court, then a contempt citation may be appropriate. That intention, however, must be established by the record.
In a per curiam filed in the court of appeal, the trial judge described relator's demeanor at the conference, in which he walked away from the conference or turned his back to the court and exhibited an "air of his obstinance to the Court's rulings". However, the judge never made a record of relator's demeanor or hostility, either at the time of occurrence or in a subsequent rule to show cause, and the present record does not contain any indication of relator's intent to disrupt the proceedings by making argument during the opening statement.[4] The trial judge himself conceded that there is often a fine line between those statements of fact or law which are appropriate for the opening statement and those which are not. Further, relator was not cited for his hostile demeanor or belligerent movements, but rather for his repeated arguments at an inappropriate time. This record does not *1191 support a conclusion that relator intended by the statement about prior convictions to defy the court's authority.

Second Contempt Citation
During relator's cross-examination of Robert Townsell, the eyewitness to the crime who identified relator's client as the assailant, relator was held in contempt for repeating the witness' answers and for repetitious questioning in violation of the judge's constant admonitions not to do so. The portion of the testimony which led to the contempt citation was as follows:
"BY MR. MILKOVICH:
(Whereupon, prior testimony was elicited by defense counsel.)
"Q How far was he from you, approximately?
"A From my car to the Salvation Army.
"Q And you were watching him closely?
"A Yeah. He was just somebody I thought was breaking in the Salvation Army.
"Q You were watching the assailant closely after he first appeared?
"A Yes, yeah.
"Q And you are saying you did or did not see a butcher knife in each hand of the person that was right there?
"MR. LAYTON: I object. This is at least the tenth time he has asked it, it is reptitious.
"THE COURT: Mr. Milkovich, you went through this earlier. You asked him this and he answered the question with respect to that question. You are being repetitive.
"MR. MILKOVICH: Judge, I need to object to the ruling. The grounds is that I have not gotten a straight answer or a consistant answer and I think that it's critical in terms of identity and I do want to state the grounds
"THE COURT: Mr. Milkovich, we have gone through this before. I am going to allow you one time to ask this witness about those knives and one time only and allow him to answer the question. Now, he cannot answer the questions so that you can write down notes. You are going to have to listen to his answers. Now, ask the question.
"BY MR. MILKOVICH:
"Q When did you first see the butcher knife in each hand?
"A When I approached him when he was stabbing Doris. This is when I seen the butcher knife, not when he was walking down the street because I didn't know it was him, I just thought it was a fellow trying to break into this building.
"THE COURT: Ask your next question, Mr. Milkovich.
"BY MR. MILKOVICH:
"Q You are saying you didn't see the butcher knife because you didn't know it was
"MR. LAYTON: Objection, Your Honor. He is stalling to write down the answers. He has asked that question before and the objection is sustained.
"THE COURT: Objection is sustained, Mr. Milkovich, ask your questions. If you don't conclude your examination of this witness I am going to have the witness be dismissed. You have to ask him questions. You can't ask him and write notes at the same time. The witness is there to try to respond to your question, go ahead and ask a question.
"BY MR. MILKOVICH:
"Q You say you can't remember how long the knives were either?
"MR. COWLES: Objection, repititous.
"MR. MILKOVICH: Judge, it's one thing if I am getting the same answer over and over. If I am getting a different answer every time I ask a question I think
"MR. COWLES: Objection to this editorializing.
"THE COURT: Objection sustained.
"MR. COWLES: We have been going over this an hour.
*1192 "BY MR. MILKOVICH:
"Q Go ahead and mark an "x" as to the spot where you firstwhere you were and where the assailant was when you first saw the butcher knives, Mr. Townsell.
"A Right here on the corner.
"Q Make an "A" for the assailant and mark yourself with your initials as to the first time you saw the butcher knives.
"A This is on the corner, this is where I saw him.
"Q The assailant was here and you were here?
"A This is where I was.
"Q Mark an "A" where the assailant was and mark your initials where you were.
"A Okay. I was coming this way.
"Q Mark where you were when you first saw the butcher knives?
"A About middle way of Milam.
"Q Is this area in hereare there any street lights around here that would allow to you see this person very well?
"A I don't understand.
"Q The question, Mr. Townsell, was there any street lights around in here that would allow you to see this person when he was up in there?
"A Yeah, street lights on the opposite side of the street. Street lightas a matter of fact, there is a light there in the Salvation Army.
"Q So, there were street lights to allow you to see him but you were still unable to see him.
"MR. COWLES: Objection. Your Honor, this is the same thing we are going through time and time again. You told him not to repeat the answers and it is repititious again.
"THE COURT: Mr. Milkovich, ask the witness a question. Do not repeat the witness' answer.
"BY MR. MILKOVICH:
"Q How long was Doris out of the car beforehow long was it between the time she got out of the car and the time she was attacked?
"A About as long as it take her to walk from my car to Milam.
"Q In other words, she got out just before the attack?
"A Yeah, I didn't have the
"THE COURT: What was your answer, the court reporter didn't hear what your answer was.
"THE WITNESS: I said, no, it didn't happen in the car, it happened on Christian and Milam. You said how long did it take. I don't know, about how long it take a person to walk from the car to the next block.
"BY MR. MILKOVICH:
"Q Now, the assailant was here and there were street lights clearly illuminatingwhy couldn't you see who it was?
"MR. COWLES: Object, Your Honor, he has answered that.
"THE COURT: Mr. Milkovich, the objection is sustained.
"MR. MILKOVICH: Judge, I object. I think I am
"THE COURT: Your objection is noted, continue.
"MR. MILKOVICH: Judge, I need to state my grounds for the objection which is
"THE COURT: you will have an opportunity to do that, Mr. Milkovich. The objection is sustained. Continue with your questioning.
"MR. MILKOVICH: Judge, I need to approach the bench for a moment if I May.
"THE COURT: Very well.
(Whereupon, a discussion was had at the Bench off the record.)
"THE COURT: Proceed with your questioning, Mr. Milkovich.
"MR. MILKOVICH: Yes, sir.
"BY MR. MILKOVICH:
"Q It is true that you in fact scared the attacker away?
"A Yes.
"Q Were you armed?
"A If I had I wouldn't have charged two butcher knives. I say, if I was I *1193 wouldn't have run-up on two butcher knives, if I was armed.
"Q So you were unarmed and you scared the assailant away?
"A Yes.
"THE COURT: I told you about repeating the answers.
"BY MR. MILKOVICH:
"Q The first time that you knew who the assailant was when you came right up on the scene?
"MR. COWLES: Objection. He is making us look bad because we have to keep objecting in front of jury. You specifically instructed him not to keep repeating these questions, Your Honor.
"THE COURT: Mr. Cowles, be seated. Mr. Milkovich, conclude your cross examination and have Mr. Townsell mark on that chart whatever it is you wish him to mark so he can return to the witness stand and bring your cross examination to a close.

"BY MR. MILKOVICH:
"Q No ID here but ID there. You didn't know who it was here but right there is where you knew who it was?
"A Yes.
"Q Was there a street light there?
"A Yeah, there was a street light all the way down.
"Q You didn't know who it was until you got right up on him?
"MR. COWLES: Your Honor, that is about the twelth time.
"THE COURT: Mr. Milkovich?
"MR. MILKOVICH: Judge, I would like to object. You are not allowing me to make my objection.
"THE COURT: Mr. Sheriff, take the jury out.
(Whereupon, the jury was excused from the Courtroom.)
"THE COURT: The jury has been excused. Mr. Townsell, you may step outside. Approach the bench first of all.
(Whereupon, a discussion was had at the Bench off the record.)
"THE COURT: Mr. Milkovich, the State has objected numerous times during these proceedings to your repeating the answers before the jury and your repetitiveness. I have specifically told you and warned you several times not to repeat those answers to the jury. You have continued to do so despite the specific order that I gave you in respect to that. I earlier found you in contempt of this Court for a prior violation and delayed the imposition of sentence on that fine. On the earlier contempt I am imposing a fine of a hundred dollars for that contempt making it payable within twenty-four hours after completion of this trial. With respect to the current matter, I find that in light of all the warnings the Court has given you on the record regarding your questioning of the witness you are continuing to engage in disorderly behavior with the witnesses and before this Court in total disregard to the orders that I have given you not to sound off in front of the jury, not to continue repeating answers of the witness. You nevertheless tend to deliberately do that in direct disobeyance to my orders which I find not only impairs the dignity of this Court but shows other lack of respect to the Court and its ruling. As to this current matter, I again find you in contempt of the Courts order for failing to abide by the rule that I set forth for the examination of this witness. The Court has attempted to give you extreme latitude in terms that you can conclude the examination of the witness. It has been spelled out clearly on the record what you are suppose to do and you have disobeyed it to no end. I find you in contempt on this end matter for violating my order not to repeat answers of the witnesses before the jury and you have continued to do that. It is a direct contempt that I find you in *1194 violation of. Do you have any response you wish to make to that?
"MR. MILKOVICH: Yes, Judge, I need to make an objection, finally, now that the jury is out. You have told me at the bench I cannot make objections, I cannot state the basis for my objections. The State repeatedly makes objections. I do not understand how I am suppose to make an appellate record if everything is done at the bench and you tell me, Mr. Milkovich, you cannot object, you cannot say anything in front of the jury. If you want to make your record you do it after the trial. How can I make the record after the trial? Am I suppose to keep a list of four hundred objections?
"THE COURT: I asked you if you had any response to having been found in contempt?
"MR. MILKOVICH: Yes, sir, I do. I think I am trying to conduct a competant cross examination in an attempted second degree murder case where a man is potentially looking at staying the rest of his life in the penitentiary. The witness has continually changed his answers on very single question and I don't agree with the
"MR. LAYTON: I ask that he lower his voice, the jury can hear him saying that.
"MR. MILKOVICH: He is changing his answers on every question I asked him. He has given me five or six different responses to every question. I cannot tell what is repetitive. I don't think it is the questions that determines repetitiveness, it is the answers. And it is impossible to be repetitive because I get a different answer every time I ask him the same question.
"THE COURT: Mr. Milkovich, do you have anything else to say on the contempt?
"MR. MILKOVICH: Yes, Judge, I didn't intentionally violate any rule. I am just trying to conduct competent cross examination. What you call repetitive I don't deem to be repetitive. This last thing which I think I am being held in contempt for, we finally established that it's well-lit here. I asked the first time
"THE COURT: Mr. Milkovich, lower your voice.
"MR. MILKOVICH: Even though it was well-lit here you did notI think he may have previously testified that he did not make an identification until right there. However, for the first time we established clearly that it was well-lit here and that he did not make an identification here. Your Honor is basically telling me that even though I am eliciting new facts on cross examination that I cannot interrogate them into new questions. I don't think it is repetitive to say that even though it was well-lit here you could not make an identification. That question had not been previously asked. The question that had been previously asked was you were not able to make identification here even though you were watching him the whole time. I am putting his own answers together to form new questions for cross examination. I did not intentionally violate the Courts order. I am conducting a cross examination. They are going to have the same right when they get him on the stand and I fully expect that they will do it.
"THE COURT: Do you have anything else to say about the contempt?
"MR. MILKOVICH: Yes, Judge, I need to object. You are saying to me, Mr. Milkovich, you cannot make objections in front of the jury.
"THE COURT: I asked you if you had anything else to say about the contempt, not about objections.
"MR. MILKOVICH: I do need to get that objection taken care of.
"THE COURT: I will allow you to.
"MR. MILKOVICH: I disagree. I notify the Court of my intention to apply for writs. I don't believe that I have intentionally violated any ruling of the Court. I don't mean to be disrespectful *1195 to the witness or to the jurors or to Your Honor. I am merely trying to conduct my cross examination. I disagree that what I asked was repetitive. It's repetitiveit's not repetitive because I think the analysis as to whether something is repetitive is not the question but the answer. If the answer changes every time then it is not repetitive. Also, it is not repetitive for the simple reason that we just finally got established
"THE COURT: Mr. Milkovich, I find you in contempt of violating my order of repeating the answers of the witness to the jury after I specifically told you several times not to. The State continued to object. You are not found in contempt for asking repetitive questions, I think you ought to understand that." (emphasis added)
From the partial transcript of the witness' testimony contained in this record, it is clear that counsel engaged in the practice of asking repetitive questions, although it is not as clear that he constantly repeated the witness' answers, at least to any degree that was disruptive of the proceedings. Generally speaking, an occasional repeating of a witness' answer is accepted cross-examination strategy. However, the issue is not whether the judge's ruling on the objection was correct, but whether relator's conduct constituted contumacious behavior toward the judge which tended to interrupt the court's business or to impair the court's dignity or the respect for its authority, as contemplated by Article 21(5).
At two times during the quoted questioning of the witness, the judge warned relator about being repetitive and threatened to curtail or terminate the questioning of that witness. When relator continued to revert to asking repetitious questions or to repeating answers, the appropriate procedure for the judge was to limit or end the examination. Under the circumstances shown by the partial transcript, the judge abused his discretion by employing his contempt power to prevent continued asking of repetitious questions and repeating of answers. We conclude that the partial record fails to establish that relator's use of repetitive questions constituted contumacious conduct by which he intended to impair the dignity of the court. The conviction of criminal contempt under the second citation must be reversed.

Third Contempt Citation
The third instance in which relator was held in contempt was during his questioning of Victor Reese about the habits of Robert Townsell, the prosecution witness who identified relator's client as the assailant. The record contains only the following testimony by Reese leading up to the contempt citation:
"BY MR. MILKOVICH:
(Whereupon, previous direct examination was had by defense counsel.)
"Q Do you ever have occasion to see passengers driving in that car with the driver?
"A Well, that's what I just said. There was somebody in there yesterday but like I said I couldn't tell you who it was.
"Q What about on other occasions, have you seen that car with passengers?
"A Yeah, I have seen him and his friends, I guess.
"Q What kind of friends, male or female?
"MR. COWLES: Objection, this is all irrelevant. What is the point?
"MR. MILKOVICH: Judge, I am establishing the exact direct fact that he is a pimp.
"MR. LAYTON: We object to that, Your Honor.
"MR. COWLES: You just told him not to do that. Mr. Milkovich continues to
"MR. MILKOVICH: Judge, he lives in the Bottoms.
"THE COURT: Lets go outside.
*1196 (Whereupon, a conference was had outside the presence of the jury.)"[5]
At the bench conference, the judge issued a contempt citation for relator's violation of an earlier order to refrain from editorial comment on objections in front of the jury. The partial transcript, however, does not contain the earlier order, and relator and the judge disagreed during the bench conference concerning the scope of the earlier order. When an attorney has been held in contempt for violation of a court order during a trial, either the record on appeal must contain the precise order alleged to have been violated or the parties must agree on the contents of the order.
Relator's conduct in making comments which placed before the jury certain facts which may not be admissible as evidence was clearly improper and reprehensible. Indeed, relator added to the impropriety by making a second comment following the prosecutor's objection. Nevertheless, relator was not cited for contempt because of this independently improper conduct, but for violation of an order not disclosed by the record. The conviction on the third contempt citation must be reversed because of this evidentiary insufficiency.

Fourth Contempt Citation
The fourth contempt citation occurred during relator's closing argument. The argument immediately preceding the contempt citation was as follows:
"MR. MILKOVICH: ... Well, how many lies do they have to tell you before you realize the whole case is a lie. Did you get mad about this business about the whole case being tried behind closed doors? Who hid the truth in this case and who 
"MR. LAYTON: we object to that, it is out of line.
"THE COURT: Mr. Milkovich, your closing argument is improper.
"MR. MILKOVICH: I want you to
"THE COURT: Mr. Milkovich, you will restrain yourself and confine your argument to the jury on the evidence which has been adduced in this trial and before this jury and nothing else.
"MR. MILKOVICH: Thank you. Perhaps you all can determine for yourselves who was hungry for the truth in this case.
"MR. LAYTON: Your Honor, we object, that is the same type of statement.
"THE COURT: The objection is sustained, Mr. Milkovich. You will confine your argument to the evidence which has come forward from this trial and nothing else.
"MR. MILKOVICH: Maybe we will try this. Who wanted the truth? That's my only question, you all can figure that out, I think it is apparent to everybody in the Courtroom. Who has watched their case disintegrate right in front of their very eyes
"MR. LAYTON: Your Honor, we object to this. It is the same thing, it is the third time. He has been warned about this.
"MR. MILKOVICH: May I please make my closing argument on behalf of this innocent man?
"THE COURT: Mr. Milkovich, the Court does not want to have to interrupt you again in your argument. You will restrain your tone of voice in your argument, slow down, and, confine your argument to the evidence which came in the case. If you cannot conform to that the Court will go out of the hearing of the *1197 jury on this matter. Now, continue your argument.
"MR. MILKOVICH: Thank you. This is the heroic track of Robert Townsell who only, like I say, got caught lying on every fact in the case. If Johnny Wright did it why did Robert Townsell lie about every fact in the case. Can you figure that out? Where do the lies end and where does the truth begin? Where do the lies end? And if you are wondering, if you have a hard time figuring, well, gee, he lied abut this and he lied about that and he lied about this and he lied about that. Well, can you believe anything he says? Where is that photograph. This is an interestingwe are not able to prove who did it. All we did is prove he didn't do it. We don't know who stabbed Doris Wright because he wasn't there and I wasn't there. But there are a few interesting questions aboutit could have been somebody that was mad that tried to pay her for a trick that didn't get satisfaction. It could have been a drug dealer. The cops clearly testified this is the highest crime rate area, it is on the edge of the Bottoms. There's junkies, drug addicts, everybody down there. Packing knives, a bunch of insanemaybe Townsell had her put away, I don't know. Can you figure this out? Can you figure this out? Where was the blood in this case? Where was the blood in this case? All over Robert Townsell's car. Remember him, he is the honest guy. He is the same one that walked right by the murder knife and told us that he told the police about it and the police come up here and say, I never heard anything about a knife, I didn't know there was one. They talk about witnesses not showing. Where are the cops that investigated this crime? For goodness sakes. Not a single cop that went to the investigating crime to investigate the crime was called to testify. Does that give you a problem? Does that give you a problem that not a single cop that went to the scene came to Court. They were so afraid that the truth was going to come out in this case. That you all were going to find out
"MR. LAYTON: I object, I object at this time.
"MR. COWLES: That is a personal comment.
"MR. LAYTON: That was a personal comment, he must be admonished.
"THE COURT: Ms. Clerk, mark the time as eighteen minutes till six. Mr. Milkovich, you will step outside.
(Whereupon, a conference was had outside the presence of the jury.)
"THE COURT: State your objection.
"MR. LAYTON: This is the fourth time he's put in personal comments abut trying to seek the truth implying that we are not.
"MR. MILKOVICH: I can go into that.
"MR. LAYTON: He was specifically warned not to personalize.
"MR. MILKOVICH: I didn't personalize.
"MR. LAYTON: May I finish, please?
"THE COURT: Hold it, you will get a chance to respond.
"MR. LAYTON: Our objections have been sustained three times or two times and he just did it again directly in violation of your order.
"MR. MILKOVICH: That's not true at all, I didn't make personal attacks. I said the State's case doesn't correspond to the truth. I said you hid the truth. That's notthat is what I am saying, I have got a right to say it, I want to finish.
"THE COURT: Mr. Milkovich, you can finish your closing argument within the guidelines that this Court sets forth. I told you before we started you would not start ranting and raving and during the closing arguments. You are hollering at the top of your voice, beating on the diagram and you tore it. You are screaming and hollering all over the jury. You back off of that jury. I have told you before, I have stopped you about this personal opinion about the case and this personalizing to the prosecutors about them not being interested in the truth.
*1198 "MR. MILKOVICH: Come on, they are sitting there calling my guy a lier and I am calling their witness a lier.
"THE COURT: You can argue the evidence in the case, not the prosecutors, nothing more. All of this outside of the record business about your personal opinions has no place
"MR. MILKOVICH: Okay, I object to my closing.
"THE COURT: To the argument?
"MR. MILKOVICH: I object to my argument being disrupted and by the State. Can we finish?
"THE COURT: You will finish with your tone lower.
"MR. MILKOVICH: Lower, sure.
"MR. LAYTON: We want something done, I am sick of this.
"THE COURT: You will finish your closing argument.
"MR. MILKOVICH: And then I will go to jail, that's fine.
"THE COURT: You will finish your closing argument, Mr. Milkovich. I have warned you about this before we started. You are in direct disobeyance to the orders that I gave you about proper conduct. This is highly and extremely improper.
"MR. MILKOVICH: Would you please hold me in contempt and let me finish.
"THE COURT: You are appealing to inflame the jury by standing all over them and waiving and ranting and raving and hollering about the State not being interested in the truth. You have got a lot of evidence to argue in this case. If you are putting on a show out there for the other members of your staff you can
"MR. MILKOVICH: I am going to try to win the case.
"THE COURT: You are hereby found in contempt of this Court order. Do you have any response?
"MR. MILKOVICH: I am doing the same thing only I am doing it better. Lets go and finish.
"THE COURT: The execution of sentence on this contempt is deferred. You will continue to conform with my orders. No more of this, Mr. Milkovich.
"MR. MILKOVICH: No more closing argument?
"THE COURT: You can go do your closing argument. I stopped the time and the time will start back when we go back inside. No more of this business of me having to bring you our here in the middle of your argument because you are hollering and ranting and screaming and acting like you don't have any sense.
"MR. MILKOVICH: Lets go, lets go, lets go. I want to go, I want to get it finished."
When argument was resumed before the jury, relator made two more references to prosecutorial motive, whereupon the judge sustained objections and warned relator that his argument would be terminated in the event he failed to confine his comments to the evidence. Several minutes later, relator again strayed from the proper bounds of argument, and the judge limited him to an additional two minutes of summation. At the end of this time, the judge had to instruct relator three times to be seated before he ceased arguing, and even then relator continued (as noted in the record) to make gestures and wave evidence to the jury.
As to this conviction, the record clearly supports the judge's finding of contumacious behavior toward the judge which tended to interfere with the business of the court and to impair its dignity. In his per curiam, the judge aptly stated that relator's "surly, belligerent and reprehensible conduct was so disdainful that the court had no alternative but to find him in contempt".
Relator's behavior far exceeded the limits of zealous advocacy. The argument itself was highly improper, not only because closing argument should be confined to the evidence or lack thereof or inferences reasonably drawn therefrom, but also because relator leveled a vicious attack on *1199 the integrity of the prosecutor and the judge which is not in any manner suggested by the record. When referring to the "whole case being tried behind closed doors", relator (according to the trial judge's per curiam) pointed to the door of the room where several bench conferences had been held, suggesting that the court held conferences in that room to hide the truth from the jury. See In re Masinter, 355 So.2d 1288 (La.1978). After several warnings, relator blatantly and deliberately continued to employ the identical tactics with virtually the identical remarks, indicating a deliberate disregard for the authority of the court. The trial judge correctly determined that it was necessary to interrupt the closing argument and to conduct a conference outside the presence of the jury.[6] At the conference relator's disorderly conduct worsened, and he clearly displayed his utter disdain and disrespect for the court's authority. Indeed, relator invited the contempt citation, and the judge, after exhibiting admirable restraint and exemplary demeanor, finally issued the citation.
The purpose of charging and convicting a person for criminal contempt is to vindicate the public interest by punishment of contemptuous conduct. R. Perkins, Criminal Law 533 (1969); In re Harris, 493 So.2d 1199 (La.1986). The fair and efficient administration of justice requires that respect for the dignity of the courts be maintained and that willful disobedience or deliberate defiance of the court's authority be punished.
We conclude that the conviction was supported by the evidence and that the seriousness of the deliberate misconduct clearly justified the sentence of twentyfour hours in jail.

Decree
The first three convictions of contempt and the sentences therefor are reversed, and relator is discharged as to these counts. The fourth conviction of contempt and the sentence therefor are affirmed.
DIXON, C.J., concurs.
BLANCHE, J., dissents and will assign reasons.
NOTES
[*] Blanche, J., retired, participated in this case ad hoc in place of Cole, J., the matter having been heard and submitted before Justice Cole replaced Justice Blanche on the Court.
[1] If the aim of the court is to force the person into compliance with the order, the contempt is civil. See United States v. Schillitani, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Here, the contempt was clearly criminal, because the object was obviously punitive rather than remedial. See Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911).
[2] The trial judge ordered the transcript of only selected portions of the record of the five-day trial, obviously to avoid the expense of transcribing the irrelevant portion of the trial which resulted in an acquittal and from which there could be no appeal.
[3] Relator asserts a complete transcript would show the trial judge allowed the prosecutor greater latitude; punished him for conduct similar to that tolerated of the prosecutor; tried to prevent him from zealously defending his client; and required him to conduct his defense in a lifeless and mechanical fashion.
[4] When a judge intends to find a person in direct contempt of court, he may insure that the record is sufficient to support the finding by making a contemporaneous record of the pertinent facts and circumstances, or he may issue a rule to show cause to be heard at a later time for the purpose of making such a record.
[5] Relator's client was accused of attacking his own wife on the street. Relator's client denied that he was the attacker, but the wife and Townsell identified him as the assailant who inflicted slash wounds with two knives. Relator asserts that the defense was that Townsell was a pimp who exercised considerable influence over many prostitutes, including relator's client's wife. The theory of the defense was that Townsell exercised his domination over relator's client's wife to persuade her to testify falsely.
[6] In his per curiam, the trial judge described relator's manner of delivering the closing argument as follows:

"Defense counsel attempted from the time he rose to begin his closing argument to `put on a show' in front of the jury notwithstanding the Court's prior instructions throughout the trial and before closing arguments as to the scope of proper closing arguments. Mr. Milkovich's voice level got so high at one point, the court had to gavel him down to restrain himself in order that the court reporter could follow him. During his closing, Mr. Milkovich pounded a chart, knocked a hole in it and knocked it to the floor, grabbed items, and literally ran from the back of the rail to the water fountain and around the table and flailed himself before the jury and almost into the laps of the jurors on the first row."
An audiotape of the closing argument supports these observations and vividly demonstrates the contemptuous behavior.